**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: DUPIXENT PRODUCTS LIABILITY LITIGATION | MDL No. 3180 |

**RESPONSE OF DEFENDANTS REGENERON PHARMACEUTICALS, INC., SANOFI-AVENTIS U.S. LLC, AND GENZYME CORPORATION TO MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407**

1

Defendants Regeneron Pharmaceuticals, Inc. ("Regeneron"), Sanofi-Aventis U.S. LLC ("Sanofi"), and Genzyme Corporation ("Genzyme") (collectively, "Defendants") respectfully submit this response to the Motion for Transfer pursuant to 28 U.S.C. § 1407.

### INTRODUCTION

Dupixent® (dupilumab) is a groundbreaking, first-in-class biologic therapy that has improved the lives of millions of patients worldwide.  First approved by the U.S. Food and Drug Administration ("FDA") in 2017 for the treatment of atopic dermatitis, Dupixent has earned regulatory approval in more than 60 countries and has been tested in over 60 clinical trials of more than 10,000 patients suffering from a broad range of inflammatory diseases.  In 2025, Dupixent was awarded a prestigious Prix Galien USA Award, which recognizes extraordinary scientific innovations that improve the human condition.  Now, in stark contrast with the findings of the European Medicines Agency, the scientific literature, and extensive post-marketing data across multiple indications, plaintiffs' attorneys allege that Dupixent causes or exacerbates cutaneous T-cell lymphoma—a rare blood cancer that manifests in the skin.

Defendants are confident that this litigation will confirm what scientists already know: that the scientific literature and the preclinical, clinical, and post-marketing data do not support plaintiffs' claims.  For that reason, Defendants urge the Panel to consolidate these actions into a multidistrict litigation before a court that will be well-positioned to address the threshold common dispositive question of general causation—whether Dupixent causes or exacerbates cutaneous T-cell lymphoma.  Though the answer is clear (it does not), the underlying scientific and technical issues are complex.  Notably, atopic dermatitis (which Dupixent treats) is both associated with a higher risk of developing cutaneous T-cell lymphoma and can appear nearly

indistinguishable from it. As a result, this litigation will require careful analysis of a voluminous body of epidemiological and clinical data and is best suited for a court with significant judicial resources and experience with multidistrict and products liability litigation.

In addition, this litigation is nationwide in scope and should be situated in a convenient, easily accessible forum. The two defendants named in every related complaint are headquartered in the New York metropolitan area, as is plaintiffs' counsel with the most pending cases. Defendants respectfully submit that these cases should be transferred to the Southern District of New York, or, in the alternative, the Southern District of Florida or the Middle District of Florida.

## FACTUAL BACKGROUND

### I.   Dupixent

Dupixent is a breakthrough medication prescribed by physicians to treat millions of patients with serious inflammatory diseases. Unlike the immunosuppressants or corticosteroids that came before it, Dupixent was based on the unifying scientific hypothesis that many allergic and atopic diseases are driven by excess interleukin-4 (IL-4) and interleukin-13 (IL-13), two key drivers of type 2 inflammation. In 2017, Dupixent became the first dual blocker of IL-4 and IL-13 approved by FDA for the treatment of adults with moderate-to-severe atopic dermatitis ("AD"), a form of eczema. Since then, the Agency has reviewed more than 30 supplemental submissions for Dupixent and has approved it for eight additional indications, including (as recently as last month) approval to treat children as young as 6 years old for allergic fungal rhinosinusitis. Dupixent is manufactured and commercialized by Regeneron Pharmaceuticals, Inc. and its alliance partner Sanofi-Aventis U.S. LLC.

Plaintiffs' allegation that Dupixent causes or accelerates the development of cutaneous T-cell lymphoma ("CTCL") is not scientifically sound. CTCL is notoriously difficult to diagnose,

3

and its clinical presentation overlaps with AD—the treatment condition for all plaintiffs.  AD

patients also have an elevated risk of CTCL and typically will have used therapies that carry

risks of lymphoma before receiving Dupixent.  Indeed, to this day, neither FDA nor EMA has

determined that Dupixent causes or accelerates CTCL, and for good reason: the available clinical

and post-marketing data do not support plaintiffs' claims.

## II.    The Nature of the Alleged Injury

CTCL is a rare type of blood cancer that originates in certain white blood cells and

primarily affects the skin.[1]  There are several subtypes of CTCL of which the most common is

mycosis fungoides ("MF"), accounting for roughly 60% of all CTCL cases.[2]  Diagnosing CTCL

is difficult because, in its early stages, it presents like many common skin conditions—especially

AD.[3]  CTCL typically appears as patches and plaques on the skin that can be nearly

indistinguishable from eczema, both to the naked eye and under a microscope.  In addition, a

patient may have both AD and CTCL lesions, making biopsy more challenging.[4]  Reaching a

reliable CTCL diagnosis requires a combination of clinical examination, tissue analysis, and

---

[1] Sarah I. Jawed et al., *Primary Cutaneous T-Cell Lymphoma (Mycosis Fungoides and Sézary Syndrome): Part I*, 70 J. AM. ACAD. DERMATOL. 205.e1 (2014).

[2] Rein Willemze et al., *The 2018 Update of the WHO-EORTC Classification for Primary Cutaneous Lymphomas*, 133 BLOOD 1703 (2019).  CTCL is rare (overall incidence 8.55 per million from 2000–2018, up from 6.4 per million in 1973–2002), but its incidence has been increasing for decades—a trend that predates Dupixent by a generation. *See* Zhuo Ran Cai et al., *Incidence Trends of Primary Cutaneous T-Cell Lymphoma in the US from 2000 to 2018: A SEER Population Data Analysis*, 8 JAMA ONCOL. 1690 (2022); Vincent D. Criscione & Martin A. Weinstock, *Incidence of Cutaneous T-Cell Lymphoma in the United States, 1973–2002*, 143 ARCH. DERMATOL. 854 (2007).

[3] Denis Miyashiro & José Antonio Sanches, *Mycosis Fungoides and Sézary Syndrome: Clinical Presentation, Diagnosis, Staging, and Therapeutic Management*, 13 FRONT. ONCOL. 1141108 (2023).

[4] Charlotte Sheern et al., *Mycosis Fungoides: A Review*, 50 CLIN. & EXP. DERMATOL. 2365 (2025).

molecular testing over several years,[5] and confirming an uncertain diagnosis can require repeated biopsies over an extended period of time.[6] Indeed, many patients with CTCL initially test negative for the disease following several rounds of biopsies before receiving an accurate diagnosis.[7]

Further, AD itself is associated with an elevated risk of CTCL.  Cases of long-standing, biopsy-confirmed AD evolving into CTCL have been documented in the literature for decades.[8] Studies conducted before Dupixent existed showed that AD patients—particularly those with severe disease—face a significantly higher risk of lymphoma than the general population.[9]  And recent research confirms that CTCL is the lymphoma subtype most strongly associated with AD

---

[5]  Denis Miyashiro & José Antonio Sanches, *Mycosis Fungoides and Sézary Syndrome: Clinical Presentation, Diagnosis, Staging, and Therapeutic Management*, 13 FRONT. ONCOL. 1141108 (2023).

[6] Charlotte Sheern et al., *Mycosis Fungoides: A Review*, 50 CLIN. & EXP. DERMATOL. 2365 (2025); Emmilia Hodak et al., *Real-Life Barriers to Diagnosis of Early Mycosis Fungoides: An International Expert Panel Discussion*, 24 AM. J. CLIN. DERMATOL. 5 (2023); J.J. Scarisbrick et al., *The PROCLIPI International Registry of Early-Stage Mycosis Fungoides Identifies Substantial Diagnostic Delay in Most Patients*, 181 BRIT. J. DERMATOL. 350 (2019).

[7] Charlotte Sheern et al., *Mycosis Fungoides: A Review*, 50 CLIN. & EXP. DERMATOL. 2365 (2025).

[8] Nicolas Meyer et al., *Cutaneous T Cell Lymphoma Complicating Severe Atopic Dermatitis: Is Making a Diagnosis the Main Challenge?*, 218 DERMATOL. 168 (2009); C.W. Van Haselen et al., *Sézary Syndrome in a Young Man with Severe Atopic Dermatitis*, 140 BRIT. J. DERMATOL. 704 (1999); G. Lange-Vejlsgaard et al., *Fatal Cutaneous T Cell Lymphoma in a Child with Atopic Dermatitis*, 20 J. AM. ACAD. DERMATOL. 954 (1989).

[9] Lena Hagströmer et al., *Incidence of Cancer Among Patients with Atopic Dermatitis*, 141 ARCH. DERMATOL. 1123 (2005); Felix M. Arellano et al., *Risk of Lymphoma Following Exposure to Calcineurin Inhibitors and Topical Steroids in Patients with Atopic Dermatitis*, 127 J. INVESTIGATIVE DERMATOL. 808 (2007); Felix M. Arellano et al., *Lymphoma Among Patients with Atopic Dermatitis and/or Treated with Topical Immunosuppressants in the United Kingdom*, 123 J. ALLERGY & CLIN. IMMUNOL. 1111 (2009).

among adults, with increased risk correlated with AD severity.[10]  Patients with moderate and severe AD—the AD population for which Dupixent is indicated—thus carry an increased background risk of developing CTCL.

Moreover, before receiving Dupixent, patients typically have spent years being treated with other medications that carry independent risks of lymphoma, including systemic immunosuppressants and topical calcineurin inhibitors.[11]  Topical corticosteroids also have been associated with an elevated risk of non-Hodgkin lymphoma with skin involvement.[12]  Because early-stage CTCL typically progresses over years or decades,[13] any CTCL diagnosed after a patient starts Dupixent may have been developing during prior treatment.

## III.     The State of Scientific and Regulatory Review

Recent epidemiological studies have posited a possible association—but not causation—between Dupixent and CTCL and have called for further research.  These studies, however, fail to control for AD disease severity, which is a significant methodological limitation because Dupixent is indicated for patients with moderate-to-severe AD whose disease is inadequately controlled by conventional therapies.  As a result, patients treated with Dupixent represent the sickest AD population: the population with the highest underlying incidence of CTCL, the

---

[10] Joy Wan et al., *Malignancy Risk in Patients with Atopic Dermatitis: A Population-Based Cohort Study*, 189 BRIT. J. DERMATOL. 53 (2023); Yun Zhu et al., *Atopic Dermatitis and Skin Cancer Risk: A Systematic Review*, 12 DERMATOL. & THERAPY 1167 (2022).

[11] Sandimmune (cyclosporine) Label (Mar. 2026); Cellcept (mycophenolate mofetil) Label (June 2025); Imuran (azathioprine) Label (July 2024); Protopic (tacrolimus) Label (Feb. 2019); Elidel (pimecrolimus) Label (Mar. 2014).

[12] Felix M. Arellano et al., *Risk of Lymphoma Following Exposure to Calcineurin Inhibitors and Topical Steroids in Patients with Atopic Dermatitis*, 127 J. INVESTIGATIVE DERMATOL. 808 (2007).

[13] J.J. Scarisbrick et al., *The PROCLIPI International Registry of Early-Stage Mycosis Fungoides Identifies Substantial Diagnostic Delay in Most Patients*, 181 BRIT. J. DERMATOL. 350 (2019); Charlotte Sheern et al., *Mycosis Fungoides: A Review*, 50 CLIN. & EXP. DERMATOL. 2365 (2025).

greatest likelihood of harboring misdiagnosed CTCL at baseline, and the most extensive prior exposure to therapies associated with lymphoma risk.

Despite these confounding factors, analyses relying on the FDA's adverse events database ("FAERS") compared Dupixent to therapies used to treat different conditions,[14] while analyses using the TriNetX database compared Dupixent-treated AD patients to the general AD population[15]—a cohort dominated by patients with mild disease. In neither analysis was the comparison population matched for disease severity. Multiple authors have determined that this and other limitations severely undermine any conclusions drawn from the database analysis.[16] Accordingly, the observations in the studies positing a possible association between Dupixent and CTCL reflect nothing more than the well-recognized relationship between severe AD and CTCL risk, rather than any causal association with Dupixent.

When the comparison population is matched for disease severity, the purported association disappears. Neubauer (2024) used the TriNetX database to compare dupilumab-treated patients to those treated with medications reserved for severe AD—and found no

---

[14] Leore Lavin et al., *Cutaneous T-Cell Lymphoma After Dupilumab Use: A Real-World Pharmacovigilance Study of the FDA Adverse Event Reporting System*, 145 J. INVESTIGATIVE DERMATOL. 211 (2025); Javier S. Cabrera-Perez et al., *Integrative Epidemiology and Immunotranscriptomics Uncover a Risk and Potential Mechanism for Cutaneous Lymphoma Unmasking or Progression with Dupilumab Therapy*, 155 J. ALLERGY & CLIN. IMMUNOL. 1584 (2025); Mariel L. James et al., *Response to Lavin et al. (2025)*, 145 J. INVESTIGATIVE DERMATOL. 2325 (2025).

[15] Iraj Hasan et al., *Dupilumab Therapy for Atopic Dermatitis Is Associated with Increased Risk of Cutaneous T Cell Lymphoma: A Retrospective Cohort Study*, 91 J. AM. ACAD. DERMATOL. 255 (2024).

[16] *See* Khalaf Kridin & Ralf J. Ludwig, *Response to Hasan et al.*, 91 J. AM. ACAD. DERMATOL. e169 (2024); Tai-Li Chen & Sheng-Hsiang Ma, *Comments on the Risk of Cutaneous T Cell Lymphoma Among Patients with Atopic Dermatitis Receiving Dupilumab*, 91 J. AM. ACAD. DERMATOL. e167 (2024); Tien V. Nguyen et al., *Commentary: Response to Hasan et al.*, 92 J. AM. ACAD. DERMATOL. e41 (2025); Yung-Tsu Cho & Chia-Yu Chu, *Response to Hasan et al.*, 92 J. AM. ACAD. DERMATOL. e9 (2025).

difference in CTCL risk.[17]  Kridin (2026) compared Dupixent to other systemic therapies for moderate-to-severe AD and likewise found no increased risk; the risk with dupilumab was in fact *lower* than with other treatments.[18]

Regulatory authorities have reached the same conclusion as these properly controlled studies.  In December 2022, EMA's Pharmacovigilance Risk Assessment Committee commissioned a detailed analysis examining incidence rates of CTCL among patients with AD.[19] EMA's analysis demonstrated that patients with AD have an elevated background risk of CTCL compared to the general population.[20]  EMA's analysis also demonstrated that patients with severe AD face a greater risk of CTCL than the broader AD population, independent of any biologic therapy.[21]  EMA concluded that no causal association could be established between Dupixent and CTCL.[22]

EMA's findings are consistent with FDA's own prior review, which found that a weight-of-evidence analysis of the published literature did not support a causal mechanistic or target-

---

[17] Zachary J.K. Neubauer et al., *Decoupling the Association of Dupilumab with Cutaneous T-Cell Lymphoma*, 91 J. AM. ACAD. DERMATOL. 1296 (2024).

[18] Khalaf Kridin et al., *Dupilumab Treatment Is Not Associated with Changes in Lymphoma Risk in Atopic Dermatitis and Other Type 2 Inflammatory Diseases: Data from a Large-Scale Retrospective Cohort Study*, 12 FRONT. MED. 1702736 (2026).

[19] EUROPEAN MEDICINES AGENCY, *Data Analysis Report: Incidence Rates of Cutaneous T-Cell Lymphomas (CTCL) Among Patients with Atopic Dermatitis* (Dec. 19, 2022), https://catalogues.ema.europa.eu/sites/default/files/document_files/FINAL-REPORT-AD%20and%20CTCL-Dec2022-for%20publication.pdf.

[20] *Id*. at 9, 20.

[21] *Id*. at 9–16, 20.

[22] EUROPEAN MEDICINES AGENCY, *Pharmacovigilance Risk Assessment Committee Minutes of Meeting on 09-12 January 2023* (Apr. 19, 2023) at 45, https://www.ema.europa.eu/en/documents/minutes/minutes-prac-meeting-9-12-january-2023_en.pdf.

related link between IL-4 receptor inhibition and increased cancer risk generally.[23]  And although FDA listed a "potential safety signal" between Dupixent and CTCL in late 2024, this listing is a standard step in FDA's pharmacovigilance process that expressly carries no finding of causation and no determination that a label change is warranted.[24]

## LITIGATION BACKGROUND

### I.    Filings to Date

Since October 1, 2025, plaintiffs have filed eighteen actions in a dozen different courts alleging that they suffered injuries as a proximate result of using Dupixent to treat AD.  In all but two of the cases, the only claimed injury is CTCL.[25]  These actions involve twenty-four plaintiffs (including loss of consortium plaintiffs), three defendants, and ten sets of plaintiffs' counsel.  Patients nationwide have used Dupixent.

### II.    The Parties

The current Plaintiffs reside in nine states: Florida, Pennsylvania, Alabama, Tennessee, Louisiana, Illinois, Georgia, California, and Nevada.  Plaintiffs' counsel are scattered throughout the country, but Weitz & Luxenberg, which has brought five of the eighteen pending cases (the

---

[23] CENTER FOR DRUG EVAL. AND RESEARCH, *Pharmacology/Toxicology BLA Review and Evaluation for Dupixent (dupilumab) Injection* (Dec. 6, 2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/761055Orig1s000PharmR.pdf.

[24] FDA, *Potential Signals of Serious Risks/New Safety Information Identified from the FDA Adverse Event Reporting System (FAERS)*, https://www.fda.gov/drugs/fda-adverse-event-monitoring-system-aems/new-safety-information-or-potential-signals-serious-risks-identified-fda-adverse-event-monitoring#:~:text=The%20appearance%20of,report%20is%20posted. (last visited Mar. 24, 2026).

[25] One complaint, *Richardson v. Regeneron Pharms.*, No. 25-cv-01125 (M.D. Tenn. Oct. 1, 2025), alleges that Dupixent caused the plaintiff to develop either CTCL or peripheral T-cell lymphoma, a potentially different type of non-Hodgkin lymphoma.  Another complaint, *Jaeger v. Regeneron Pharms.*, No. 26-cv-00170 (M.D. Fla. Mar. 4, 2026), alleges that Dupixent caused the plaintiff to develop either CTCL or anaplastic large cell lymphoma, a potentially different type of non-Hodgkin lymphoma.

most of any firm), is headquartered in New York City. Levin Papantonio, which represents Movants and has brought four of the eighteen pending cases, is a Florida law firm.

Plaintiffs have named Regeneron and Sanofi as defendants in all filed actions, while only some actions name Genzyme as a defendant. Regeneron, which markets and sells Dupixent in the United States and is the sponsor of the Biologics License Application for the medication, is headquartered in the New York City metropolitan area, in Tarrytown, NY (within the Southern District of New York). Counsel for Regeneron are located in New York City, Florida, Washington, D.C., and Missouri. Sanofi also markets and sells Dupixent in the United States and is likewise headquartered in the New York City metropolitan area in Morristown, NJ. Genzyme, a subsidiary of Sanofi, is also based in the northeast with its headquarters located in Cambridge, MA. Lead counsel for Sanofi and Genzyme are located in New York City.

## ARGUMENT

As a threshold matter, Defendants agree that these cases should be centralized, but request that the Panel limit the scope of the transfer order to the characteristics of the filed cases—that is, cases where the claimed injury is CTCL or its recognized subtypes.

Defendants disagree with Movants' assertion that the Northern District of Georgia is the most appropriate venue for transfer. The Southern District of New York, or alternatively the Southern District of Florida or the Middle District of Florida, would be more appropriate venues for transfer. The Southern District of New York is home to Regeneron's headquarters, is within convenient driving distance of Sanofi, and is easily accessible to both plaintiffs' and defense counsel. In the alternative, the Southern District of Florida and the Middle District of Florida are conveniently located near major transportation hubs. All three districts have experienced products liability judges with the resources and expertise to manage this litigation.

10

**I.      The Transfer Order Should Be Limited to CTCL.**

Defendants agree that the eighteen filed actions involve "common questions of fact" and that these actions should be centralized for pretrial litigation.  28 U.S.C. § 1407(a).  Defendants, however, request the Panel limit the scope of the MDL to cases where a plaintiff alleges the development of CTCL or one of its recognized subtypes.  In each of the eighteen actions that have been filed, plaintiffs allege that Dupixent may have caused or exacerbated CTCL, a specific subtype of non-Hodgkin lymphoma.[26]  The Panel should limit the scope of any centralized proceedings accordingly.

Recognized CTCL subtypes include mycosis fungoides, which accounts for approximately 60% of CTCL cases, and Sézary syndrome, a more aggressive variant characterized by circulating malignant T-cells and lymph node involvement.[27]  Primary cutaneous lymphoproliferative disorders, such as lymphomatoid papulosis and primary cutaneous anaplastic large cell lymphoma, account for approximately 25% of CTCL cases.[28]  The remaining CTCL subtypes are rare, but include subcutaneous panniculitis-like T-cell lymphoma, primary cutaneous gamma-delta T-cell lymphoma, and primary cutaneous CD8+ T-cell lymphoma.[29]  The Panel should limit the alleged injuries in the MDL to CTCL and its

---

[26] As noted above, one complaint refers to both CTCL and peripheral T-cell lymphoma, though it notes that the individual "most likely had CTCL." Complaint ¶ 82, *Richardson v. Regeneron Pharms.*, No. 25-cv-01125 (M.D. Tenn. Oct. 1, 2025).  Another complaint refers to both CTCL and anaplastic large cell lymphoma, but alleges that a biopsy was "consistent with CTCL." Complaint ¶ 73, *Jaeger v. Regeneron Pharms.*, No. 26-cv-00170 (M.D. Fla. Mar. 4, 2026).

[27] Rein Willemze et al., *The 2018 Update of the WHO-EORTC Classification for Primary Cutaneous Lymphomas*, 133 BLOOD 1703, 1704 (2019).

[28] *Id.* at 1705.

[29] *Id.*

subtypes, as there are common factual and scientific questions across them. *See* 28 U.S.C. § 1407(a).

The Panel, however, should not extend the MDL to include other categories of lymphoma or malignancy. *See, e.g.*, *In re Glucagon-Like Peptide-1 Receptor Agonists (GLP-1 RAs) Prods. Liab. Litig.*, 766 F. Supp. 3d 1328, 1329 (J.P.M.L. 2024) ("Indeed, an MDL that encompassed *any* potential injury relating to use of these . . . drugs might quickly become procedurally and substantively unwieldy."). CTCL is a subset of non-Hodgkin lymphoma, which itself encompasses dozens of distinct diseases with different etiologies, cell types, and clinical profiles. Primary cutaneous B-cell lymphoma, for example, arises from an entirely different cell lineage and presents different diagnostic and causation questions. Hodgkin lymphoma is a separate disease category altogether. And systemic T-cell lymphomas that do not originate in the skin involve different pathophysiology and would require different expert testimony and different Rule 702 motions. Including these conditions would expand the MDL beyond the factual questions common to the proposed centralized proceeding.

## II.    The Southern District of New York Is the Most Appropriate Venue for Transfer.

This litigation already is nationwide in scope. So far, plaintiffs come from nine states, and they have filed their lawsuits in a dozen district courts across the country. Nothing about the plaintiffs, their claims, or their alleged injuries is or will be tied to one specific geographic location because Dupixent is FDA approved and widely prescribed across the United States. In these circumstances, the cases should be centralized in a court that can best serve the convenience and efficiency of the litigation, and which has the experience and expertise to address complex scientific evidence. Defendants submit that the most appropriate venue for transfer would be the Southern District of New York.

The two defendants named in every related complaint—Regeneron and Sanofi—are both headquartered in the New York metropolitan area. Regeneron's headquarters are in Westchester County, which is part of the Southern District of New York. Sanofi is located just across the river in northern New Jersey. Thus, the district is a convenient forum for many of the employees who will serve as key witnesses, and much of the evidence related to the design, sale, and approval of Dupixent will be located in or near the district. There is fast and frequent rail service along the northeastern corridor from New York to Cambridge, making the district a convenient location for any Genzyme employees who may be relevant witnesses. *See* 28 U.S.C. § 1407(a).

That there is no related case currently pending in the Southern District of New York "is no obstacle to assignment of the actions there." *In re Acetaminophen – ASD/ADHD Prods. Liab. Litig.*, 637 F. Supp. 3d 1372, 1376 n.6 (J.P.M.L. 2022) (transferring cases to the Southern District of New York, close to the headquarters of several defendants, and noting that "where the parties are located nationwide, 'the location of the currently filed cases is not a particularly important factor'") (citations omitted); *see also In re: Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 780 F. Supp. 2d 1379, 1382 (J.P.M.L. 2011) (transferring to the district of a defendant's headquarters because it was the likely location of "[r]elevant documents and witnesses," even though there was no related action pending in that district); *In re: Biomet M2a Magnum Hip Implant Prods. Liab. Litig.*, 896 F. Supp. 2d 1339, 1340 (J.P.M.L. 2012) (transferring to the Northern District of Indiana despite no case being filed there yet because the defendant companies and many of the relevant documents and witnesses were located nearby); *In re Tylenol (Acetaminophen) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 936 F. Supp. 2d 1379, 1380 (J.P.M.L. 2013) (transferring to the Eastern District of Pennsylvania because a defendant was headquartered there and two other defendants were located nearby). Transfer to the

Southern District of New York would substantially reduce the need for lengthy travel for many witnesses who will be relevant to all the related cases.

The Southern District of New York also would be convenient for both plaintiffs' and defense counsel. Weitz & Luxenberg P.C., which has filed the most suits of any counsel to date, is headquartered in New York City. Lead counsel for Regeneron are based in New York City, Florida, Washington, D.C., and Missouri. Lead counsel for Sanofi and Genzyme are based in New York City. In addition to its rail service, New York City has three major airports nearby, making it accessible to parties and their counsel across the country.

Lastly, the Southern District of New York has judges with considerable experience in handling complex pharmaceutical products liability MDLs and the resultant engagement with medical literature and evidence. Judges Seibel and Engelmayer each presided over MDLs related to Mirena, a contraceptive medical device, and the district was chosen as the transferee court in those MDLs in part because the defendant was headquartered nearby. *In re Mirena IUD Prods. Liab. Litig.*, 938 F. Supp. 2d 1355, 1358 (J.P.M.L. 2013) (transferring to the Southern District of New York based on defendants' locations in the surrounding area, overall accessibility of the district, and because Judge Seibel is "an experienced transferee judge"); *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 249 F. Supp. 3d 1357, 1361 (J.P.M.L. 2017) (selecting the Southern District of New York based in part on its geographic convenience for a nationwide litigation and its proximity to defendant's "corporate headquarters in New Jersey, where many of the common documents and witnesses are likely to be located," and because Judge Engelmayer is "an experienced transferee judge with the willingness and ability to manage this litigation"). In those cases, Judges Seibel and Engelmayer navigated issues similar to those central to this litigation, including whether there was reliable evidence

14

under Rule 702 of general causation between the product and alleged injuries, how to structure the MDL to best address complicated scientific issues, and the product's extensive labeling and regulatory history.  *In re Mirena IUD*, 938 F. Supp. 2d at 1357–58; *In re Mirena IUS (No. II)*, 249 F. Supp. 3d at 1361.  In addition to Judges Seibel and Engelmayer, the district has a number of experienced products liability MDL judges, including Judge Furman and Judge Cote, who would be more than capable of handling a litigation of this size and complexity.[30]

### III. In the Alternative, the Southern District of Florida and the Middle District of Florida Also Have Capacity and Experience Handling Pharmaceutical Products Liability Cases.

While the Southern District of New York is the most convenient and best equipped jurisdiction to handle this matter, the Southern District of Florida and the Middle District of Florida, which each have pending cases, would be more appropriate than the Northern District of Georgia.  Movants' counsel is based in Florida and has filed one case against Defendants in the Southern District of Florida.[31]  The Middle District of Florida has two cases pending against Defendants.[32]  Like the Southern District of New York, both districts have judges with experience handling complex products liability actions, as well as multiple major airport hubs serving each district.  Furthermore, both courts have the capacity to take on additional MDLs.

---

[30] Judge Furman has overseen at least four MDLs, two of which contained product liability claims and issues similar to those central to this litigation. *See In re General Motors LLC Ignition Switch Litigation*, No. 14-MD-2543 (JMF) (S.D.N.Y.); *In re Zimmer M/L Taper Hip Prosthesis Litigation*, No. 18-MD-2859 (JMF) (S.D.N.Y.). Judge Cote has overseen at least nine MDLs, two of which were pharmaceutical products liability cases containing claims and issues similar to those central to this litigation.  *See In re Eliquis (Apixaban) Products Liability Litigation*, No. 17-MD-2754 (DLC) (S.D.N.Y.); *In re Acetaminophen – ASD-ADHD Products Liability Litigation*, No. 22-MD-3043 (DLC) (S.D.N.Y.).

[31] *See* Complaint, *Fraioli v. Regeneron Pharms.*, No. 26-cv-20636 (S.D. Fla. Jan. 30, 2026).

[32] *See* Complaint, *Durkin v. Sanofi-Aventis U.S. LLC*, No. 26-cv-00231 (M.D. Fla. Feb. 4, 2026); Complaint, *Jaeger v. Regeneron Pharms.*, No. 26-cv-00170 (M.D. Fla. Mar. 4, 2026).

The Southern District of Florida has 29 district judges, 17 magistrate judges, and seven MDLs.[33]  Within the district, Chief Judge Altonaga has handled a complex products liability MDL involving similar claims and issues as those posed here.  *See In re Denture Cream Products Liability Litigation*, No. 09-2051-MD-CMA (S.D. Fla.).  Judge Bloom is likewise experienced in handling complicated technical issues in litigation, *e.g.*, *Benavides v. Tesla, Inc.*, 804 F. Supp. 3d 1242 (S.D. Fla. 2025), and neither judge is currently overseeing an MDL.

The Middle District of Florida has 32 district judges and 23 magistrate judges, but only *one* pending MDL.  *In re Tasigna (Nilotinib) Prods. Liab. Litig.*, 555 F. Supp. 3d 1363, 1365 (J.P.M.L. 2021) (transferring a pharmaceutical products MDL to the Middle District of Florida in part because it "offers a convenient and readily accessible district that is underutilized as a transferee forum").  Among its many able jurists, Judge Scriven is "familiar with the contours of multidistrict litigation," *In re Prepared Food Photos, Inc., Copyright Litig.*, 678 F. Supp. 3d 1391, 1392 (J.P.M.L. 2023), and has presided over a long-running MDL but is not currently overseeing one.  *See In re 21st Century Oncology Customer Data Security Breach Litig.*, No. 8:16-MD-2737-MSS-AEP (M.D. Fla.).  Chief Judge Howard also has experience with products liability actions involving complex medical issues.  *See, e.g.*, *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307 (M.D. Fla. 2015).

Either of these venues would be appropriate because they possess experienced judges, convenient transportation hubs, and ample judicial resources to adjudicate this nationwide dispute.

## IV.    The Northern District of Georgia Is Not the Most Appropriate Venue for Transfer.

There is no significant connection between the Northern District of Georgia and this

---

[33] One of these MDLs (No. 3015) has no active cases pending on the docket.

litigation.  Dupixent has been FDA approved nationwide for the treatment of AD since 2017, and there is no reason to believe that most or even a large number of the cases that ultimately will be filed will be in the Northern District of Georgia.  That plaintiffs have elected to file a handful of initial cases there, in a litigation that undoubtedly will expand and involve plaintiffs from a number of different states, is immaterial.  In fact, one of the actions was filed in the Northern District of Georgia even though, "[a]t all relevant times," the plaintiffs resided in a different judicial district.  Complaint ¶ 11, *Long v. Regeneron*, No. 26-cv-635 (N.D. Ga. Feb. 3, 2026) (stating that "[a]t all relevant times since Brandon Long's initial injection of Dupixent, Plaintiffs were and are residents of . . . Muscogee County"— *i.e.*, the Middle District of Georgia).

Furthermore, the Federal Judicial Caseload Statistics show that the Northern District of Georgia is more congested than each of Defendants' proposed venues.  As of December 31, 2025, the Northern District of Georgia has 808 weighted filings per judgeship (the eighth highest in the country), compared to 490 in the Southern District of New York, 769 in the Middle District of Florida, and 699 in the Southern District of Florida.  *See U.S. District Court—Judicial Caseload Profiles*, UNITED STATES COURTS (Dec. 31, 2025).

## CONCLUSION

For these reasons, the Panel should order centralization of cases in which plaintiffs allege that Dupixent caused or aggravated CTCL, and those cases should be transferred for pretrial proceedings to the Southern District of New York, or in the alternative, the Southern District of Florida or the Middle District of Florida.

Dated: March 24, 2026

Respectfully Submitted,

SHOOK, HARDY & BACON L.L.P.

/s/ Adrienne Byard
Adrienne Byard
2555 Grand Blvd.
Kansas City, MO 64108
Telephone: (816) 474-6550

*Attorney for Defendant Regeneron Pharmaceuticals, Inc.*

ARNOLD & PORTER KAYE SCHOLER LLP

/s/ David Kerschner
David Kerschner
NY Bar No. 5126420
250 West 55th Street
New York, NY 10019-9710
Tel.: (212) 836-8214
David.Kerschner@arnoldporter.com

*Attorney for Defendants Sanofi-Aventis U.S. LLC and Genzyme Corporation*